1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANTHONY ARTEAGA,

11              Plaintiff,                No. CIV S-03-1004 FCD KJM P

12       vs.

13   EDWARD ALAMEIDA, et al.,

14              Defendants.          FINDINGS & RECOMMENDATIONS

15   _____/

16              Plaintiff, a state prison inmate, is proceeding pro se with this civil rights action

17   challenging the proceedings used to validate him as an associate of the Mexican Mafia and his

18   placement in administrative segregation.  Specifically, he alleges he was denied due process

19   because he was not charged with rules violations stemming from the gang activity or mail

20   violations, he was not given a property receipt or chrono for items taken from his cell and used in

21   the validation process, he was not provided copies of the written material seized from his cell and

22   used to validate him, he was not given the opportunity to meet with the decision maker before

23   validation occurred, he was not provided with a staff assistant to aid him in challenging the

24   validation or allowed to call witnesses at the Institutional Classification Committee (ICC)

25   hearing, he was denied a fair hearing to challenge his validation, he was validated based on

26   material that did not show plaintiff was a current active gang associate.  He also challenges the

1

1   use of vague and overbroad regulations for gang validation and asserts that defendants have a

2   mandatory duty under Cal. Penal Code § 2932 to afford him due process protections before

3   placing him in segregated confinement.

4           Defendants Stone, Malfi, Johnson, Kopec, Puig, Peterson, Boitano and Clement

5   have moved for summary judgment.  Plaintiff has conceded that he cannot prove his claims

6   against defendant Stone and asks that the court dismiss the case as to him.  He has also filed an

7   opposition to the remaining defendants' motion.

8   I. <u>Summary Judgment Standards Under Rule 56</u>

9           Summary judgment is appropriate when it is demonstrated that there exists "no

10  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

11  matter of law."  Fed. R. Civ. P. 56(c).

12          Under summary judgment practice, the moving party

13          always bears the initial responsibility of informing the district court
            of the basis for its motion, and identifying those portions of "the
14          pleadings, depositions, answers to interrogatories, and admissions
            on file, together with the affidavits, if any," which it believes
15          demonstrate the absence of a genuine issue of material fact.

16  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

17  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

18  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

19  to interrogatories, and admissions on file.'"  <u>Id.</u>  Indeed, summary judgment should be entered,

20  after adequate time for discovery and upon motion, against a party who fails to make a showing

21  sufficient to establish the existence of an element essential to that party's case, and on which that

22  party will bear the burden of proof at trial.  <u>See id.</u> at 322.  "[A] complete failure of proof

23  concerning an essential element of the nonmoving party's case necessarily renders all other facts

24  immaterial."  <u>Id.</u>  In such a circumstance, summary judgment should be granted, "so long as

25  whatever is before the district court demonstrates that the standard for entry of summary

26  judgment, as set forth in Rule 56(c), is satisfied."  <u>Id.</u> at 323.

1    If the moving party meets its initial responsibility, the burden then shifts to the

2 opposing party to establish that a genuine issue as to any material fact actually does exist.  See

3 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

4 establish the existence of this factual dispute, the opposing party may not rely upon the

5 allegations or denials of its pleadings but is required to tender evidence of specific facts in the

6 form of affidavits, and/or admissible discovery material, in support of its contention that the

7 dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

8 must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

9 of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

10 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

11 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

12 return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

13 1436 (9th Cir. 1987).

14    In the endeavor to establish the existence of a factual dispute, the opposing party

15 need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

16 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

17 versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

18 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

19 genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

20 committee's note on 1963 amendments).

21    In resolving the summary judgment motion, the court examines the pleadings,

22 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

23 any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

24 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

25 court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

26 Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

1    produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

2    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

3    1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

4    show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

5    as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

6    'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

7            On September 27, 2006, the court advised plaintiff of the requirements for

8    opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v.

9    Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and

10   Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  Defendants have filed a motion for

11   summary judgment.

12   II.  Facts

13           At the time relevant to the complaint, defendant Peterson was the Institutional

14   Gang Investigator (IGI) at High Desert State Prison (HDSP).  During 2001 he gathered evidence

15   suggesting plaintiff's association with the Mexican Mafia/EME prison gang.  Defendants'

16   Motion For Summary Judgment (MSJ), Ex. A, Declaration Of J. Peterson (Peterson Decl.)

17   ¶¶ 2-3.  On December 14, 2001, Peterson sent a gang validation packet, consisting of four pieces

18   of information, to reviewer D.T. Hawkes.  Opposition (Opp'n), Ex. 150.[1]  Hawkes found that

19   three of the items met validation requirements: a confidential memorandum dated December 11,

20   2001, a confidential CDC 128-B dated October 2, 2001, and CDC 128-B dated September 25,

21   2001.  Id.  On the CDC128-B form signed by Hawkes, dated January 25, 2002, in the section

22   labeled "Action of Reviewer," the form reads "[p]ursuant to the validation requirements

23   /////

24   _____

25        [1]  Most of the documents offered by plaintiff are not authenticated, but defendant has not
     objected to them.  Because they appear to be records from plaintiff's central file, the court will
26   rely on most of them in resolving the motion for summary judgment.  See Fed. R. Evid. 901(a) &
     (b)(4).

1   established in 15 CCR Section 3378, Arteaga is" and has two boxes, next to the words

2   VALIDATED and REJECTED; the "validated" box has been checked.  Id.

3          In general terms, Peterson describes the information found to meet the gang

4   validation criteria: a confidential memorandum dated December 11, 2001, in which prison staff

5   identified plaintiff as communicating with a known EME prison gang member; a confidential

6   memorandum dated September 3, 2000, and then clarified October 2, 2001, which documents the

7   discovery of written material among plaintiff's personal property, showing plaintiff's

8   participation in EME prison activity; a CDC 128-B form, dated September 25, 2001, reporting a

9   search of plaintiff's personal property, which yielded a birthday card containing EME gang

10  symbols.  Peterson Decl. ¶¶ 5, 7; MSJ, Exs. K & L (both sealed) and M (birthday card).

11         On February 1, 2002, plaintiff was removed from the general population and

12  placed in administrative segregation.  Defendants' Statement Of Undisputed Facts (DSUF) 3;

13  Plaintiff's Statement Of Facts (PSF) 3.  There is no dispute that plaintiff was told he was being

14  placed in segregation because of his putative gang status, but the parties interpret this differently.

15  Defendants contend prison staff advised plaintiff he was being placed in administrative

16  segregation pending a determination of his gang association and that he was considered a threat

17  to institutional security and to the safety of others.  MSJ, Ex. B (CDC-114-D--Administrative

18  Segregation Placement Notice, dated 2/1/02).  Plaintiff contends, however, that he had already

19  been validated as a Mexican Mafia associate on January 25, 2002.  Opp'n, Ex. 150.  Plaintiff was

20  given the CDC-114 D when he was brought to the program office before being taken to

21  segregation.  Deposition of Anthony Arteaga (Arteaga Depo.) at 24:2-4.

22         Later in the evening of February 1st, defendant Clement removed plaintiff from

23  his cell and gave him the validation packet consisting of six documents, which summarized the

24  evidence against him.  Arteaga Depo. at 26:24-27:2, 27:12-16; Opp'n, Ex. 150; Peterson Decl. ¶

25  7.  Plaintiff asked Clement if he could "address this issue" with him, but Clement declined.

26  Arteaga Depo. at 28:13-14.  Among the documents plaintiff received are two CDC-1030

1    "Confidential Information Disclosure" forms, dated February 1, 2002 and signed by defendant

2    Peterson.  The first refers to Peterson's memo of December 11, 2001 and describes, in very

3    general terms, that information obtained from plaintiff showed he was in communication with

4    members of the Mexican Mafia; the second refers to Peterson's memo of September 3, 2002,

5    which indicated that plaintiff "is actively participating in the gang activity of the prison gang

6    known as the Mexican Mafia."  Opp'n, Ex. 150; Peterson Decl. ¶ 7.  The third document was a

7    CDC 128-B chrono by defendant Peterson, documenting the September 25, 2001 search of

8    plaintiff's property, which yielded a birthday card and an envelope containing a symbol

9    connected with the Mexican Mafia.  This symbol consists of three dots over two horizontal lines,

10   which Peterson describes as the Nahuatl numeral 13, which in turn corresponds with the

11   thirteenth letter, M, in the English alphabet.  Opp'n, Ex. 150 (CDC 128-B, dated 9/25/01);

12   Peterson Decl. ¶ 7; Arteaga Depo. at 40:6-11.  Plaintiff contends, however, that he sent the

13   birthday card, containing a Mesoamercian cultural hieroglyph, to his brother Frank Venegas in

14   June 2001.  Opp'n, Ex. 156 (Declaration of Frank Venegas & attachment);[2] Arteaga Depo. at

15   40:23-25, 48:21-22.

16           Defendant Peterson avers that while in segregation, plaintiff had the opportunity

17   to speak to Peterson about the pending violation.  He continues:

18           It is my normal policy and procedure to meet with any inmate who
             is pending validation, if that inmate requests to speak with me.  If
19           Mr. Arteaga had requested to speak with me, I would have had Mr.
             Arteaga removed from his cell, so he could meet and speak with
20           me.  Mr. Arteaga did not request to speak with me at any time.

21   Peterson Decl. ¶ 6.

22           On February 4, 2002, defendant Kopec, who was acting Facility Captain,

23   reviewed plaintiff's placement in segregation.  MSJ, Ex. B; DSUF 6; PSF 6.  Plaintiff asked for a

24   staff assistant to help him prepare a defense for the upcoming hearing and asked to call defendant

25   _____

26          [2]  As plaintiff explains, this is a copy of the declaration; he believes he attached the
     original to one level of his grievance.  Defendants have not objected to its consideration.

1    Peterson as a witness.  Plaintiff wanted a staff assistant to help him secure "the items that were

2    used against me, at least in the redacted form."  Arteaga Depo. at 33:6, 58:3-8; DSUF 8; PSF 8.

3    Both requests were denied and defendant Kopec decided to retain plaintiff in segregation pending

4    ICC review because plaintiff posed a threat to institutional security.  MSJ, Ex. B; Arteaga Depo.

5    at 31:5-10.  According to plaintiff, Kopec told him he did not need witnesses or an assistant

6    because he "was already validated."  Arteaga Depo. at 31:18-20.  Kopec also told him he could

7    raise his concerns with the ICC.  Arteaga Depo. at 32:13-14.

8            On February 7, 2001, plaintiff appeared before the ICC, composed of defendants

9    Malfi, Kopec, Johnson, Clement and Boitano, for initial review of his placement in

10   administrative segregation.  MSJ, Ex. C; DSUF 9; PSF 9, 11.  The hearing lasted about five

11   minutes.  Arteaga Depo. at 42:20.[3]  According to defendant Malfi, the committee informed

12   plaintiff "he had been validated by [the Law Enforcement Investigation Unit/Law Enforcement

13   Liaison Unit] LEIU/LELU as a Mexican Mafia/EME gang associate" and that he was being

14   recommended for transfer to a security housing unit (SHU).  MSJ, Ex. J, Declaration of A. Malfi

15   (Malfi Decl.) ¶ 3; DSUF 12; PSF 12.  Plaintiff denied that he was involved in gang activities.

16   MSJ, Ex. C; DSUF 12; PSF 12.

17           The ICC had the authority to refer plaintiff's validation back to the LEIU/LELU

18   for a re-evaluation if plaintiff was able to cast doubt on the reliability of the evidence used to

19   validate him or was able to present credible evidence that he was not a gang associate.  Malfi

20   Decl. ¶ 4.  The panel agreed, however, that the three pieces of information were reliable and

21

22           [3] In his second declaration in opposition to the motion for summary judgment, plaintiff
     avers that the question of gang validation is not reexamined at ICC hearings, that the committee
23   members are predisposed to transfer the inmate to the SHU, and that the hearings are
     meaningless gestures.  Arteaga Decl. II ¶¶ 3-4.  He also alleges that even had he presented
24   evidence showing he was not a gang associate, the case would not have been referred back to the
     LEIU.  These portions of the declaration are not based on plaintiff's personal knowledge and will
25   not be considered.  Fed. R. Civ. P. 56(e).  Finally, plaintiff asks the court to ascertain from
     defendant Malfi how many cases he has referred back to LEIU; this is not the court's role.
26   Arteaga Decl. II ¶ 9.

1  sufficient to support the validation.  Malfi Decl. ¶ 5.  Plaintiff was told he could dispute the

2  findings by filing an inmate appeal.  MSJ, Ex. C; DSUF 14; PSF 14; Opp'n, Ex. 160, Second

3  Declaration of Anthony Arteaga (Arteaga Decl. II) ¶ 7.  In addition, when plaintiff sought to

4  discuss the materials used to validate him, the panel members told him he would be able to

5  address all that in the appeal to LEIU.   Arteaga Depo. at 45:13-15.

6          On February 13, 2002, plaintiff did file a grievance, arguing there was no

7  allegation of his involvement in specific gang activities and asking that the confidential material

8  be disclosed to him.  Opp'n, Ex. 153; MSJ, Ex. D.  Defendant Clement interviewed plaintiff

9  during the grievance process and defendant Stone denied the appeal at the first level.  MSJ, Ex.

10  E; Opp'n, Ex. 154; Arteaga Depo. at 47: 4-8.  Plaintiff's appeal to the second level was denied by

11  Chief Deputy Warden Colon on June 6, 2002.  MSJ, Ex. F; Opp'n, Ex. 154.  The Director's

12  Level denial was issued on August 26, 2002.  MSJ, Ex. G; Opp'n, Ex. 154.

13          While plaintiff was pursuing the grievance process, defendant Puig, the

14  Classification Services Representative, adopted the ICC's recommendation and issued a

15  classification chrono endorsing plaintiff for transfer to the SHU at California State Prison-

16  Corcoran, where plaintiff is currently housed.  DSUF 19; PSF 19; MSJ, Ex. H.

17          According to defendant Malfi, a validated gang associate can be released from the

18  SHU at any time by submitting to a debriefing about his gang activities and associates.  Malfi

19  Decl. ¶ 6.  According to plaintiff, he cannot debrief because he is not an EME associate and has

20  no information about its activities and members.  Arteaga Depo. at 50:3-5.

21  III.  Analysis

22      A.  Liberty Interest And SHU Placement

23          The Due Process Clause of the Fourteenth Amendment protects persons against

24  deprivations of life, liberty or property.  Wilkinson v. Austin, 545 U.S. 209, 221 (2005).  Those

25  who seek to invoke the procedural protections of the Due Process Clause must establish that one

26  /////

8

1   of these interests is at stake.  Id.  "A liberty interest may arise from the Constitution itself . . . , or

2   it may arise from an expectation or interest created by state laws or policies."  Id.

3            The Supreme Court has held that "the Constitution itself does not give rise to a

4   liberty interest in avoiding transfer to more adverse conditions of confinement."  Id. at 221-22

5   (citing Meachum v. Fano, 427 U.S. 215, 225 (1976)).  However, the Court also has held that "a

6   liberty interest in avoiding particular conditions of confinement may arise from state policies or

7   regulations, subject to the important limitations set forth in Sandin v. Conner, 515 U.S. 472 [ ]

8   (1995)."  Id.  Such interests generally are limited to "freedom from restraint which. . . imposes

9   atypical and significant hardship on the inmate in relation to the ordinary incidents of prison

10  life."  Sandin, 515 U.S. at 484.

11           In Wilkinson, the Supreme Court addressed whether Ohio prisoners had a

12  liberty interest protected by the Fourteenth Amendment in not being assigned to the state's

13  "supermax" prison.  Wilkinson, 545 U.S. at 223-24. The Court found that because the

14  conditions in the "supermax" imposed "atypical and significant hardship within the correctional

15  context," Ohio prisoners did have such a liberty interest.  Id. at 224.   Defendants do not dispute

16  that the conditions in the SHU, as plaintiff describes them in his complaint, give rise to a liberty

17  interest in avoiding placement therein.

18        B.  What Process Is Due

19           Assuming plaintiff had a liberty interest in being free of segregated housing,

20  defendants argue he received all the process due to him.  Plaintiff disagrees.

21           1.  Informal Hearing

22           What process is constitutionally due an inmate placed in segregation depends on

23  whether the placement is disciplinary or administrative.  Toussaint v. McCarthy, 801 F.2d 1080,

24  1099 (9th Cir. 1986).  In Bruce v. Ylst, 351 F.3d 1283, 1287 (9th Cir. 2003), the Court of

25  Appeals determined that California's policy of placing suspected gang members in segregation is

26  /////

an administrative decision, undertaken to preserve order in the prison.  When an inmate is placed

in segregation for administrative purposes, due process requires only the following procedures:

> Prison officials must hold an informal nonadversary hearing within
> a reasonable time after the prisoner is segregated.  The prison
> officials must inform the prisoner of the charges against the
> prisoner or their reasons for considering segregation.  Prison
> officials must allow the prisoner to present his views. . . . [D]ue
> process [ ] does not require detailed written notice of charges,
> representation by counsel or counsel-substitute, an opportunity to
> present witnesses, or a written decision describing the reasons for
> placing the prisoner in administrative segregation.

Toussaint, 801 F.2d at 1100-01 (footnote omitted).  Similarly, in Wilkinson, 545 U.S. at 225-28,

the Supreme Court found that Ohio's procedures satisfied the standards established by Hewitt v.

Helms, 459 U.S. 460, 476 (1983), upon which the Toussaint court relied as well: notice of the

basis for the placement and a fair opportunity for rebuttal.

Accordingly, to the extent plaintiff claims he was denied due process because he

was not given a staff assistant or allowed to call witnesses, the defendants are entitled to

summary judgment.

Due process requires an opportunity to be heard "in a meaningful manner."

Mathews v. Eldridge, 424 U.S. 319, 333 (1976); see also Wilkinson, 545 U.S. at 226 ("a fair

opportunity for rebuttal"); Madrid v. Gomez, 889 F.Supp. 1146, 1276-77 (N.D. Cal. 1995).  As

the Madrid court recognized, there is the potential for the ICC proceedings to be "hollow

gestures" because of gang policies.  Id. at 1276-77.  It found, however, that the plaintiffs in that

case had not presented sufficient information showing that ICC hearings in general were

"perfunctory formalities."  Id.

In this case, however, the evidence about the hearing is in dispute.  According to

Arteaga, the hearing took no more than five minutes and the hearing officers told him to raise his

concerns in his appeal to the LEIU.  Arteaga Depo. at 42:20, 45:13-15; PSF 14.  According to

defendant Malfi, plaintiff was given the opportunity to be heard and to dispute his gang

validation.  Malfi Decl. ¶ 4.  Thus, there is disputed evidence on the meaningfulness of the ICC

1   hearing before defendants Malfi, Kopec, Clement, Johnson and Boitano, which precludes

2   summary judgment on this point.

3               2.  <u>Meeting With The Institutional Gang Investigator</u>

4               In the gang validation context, an inmate is entitled to another layer of informal

5   procedures.  Before being removed from general population, the inmate must "receive some

6   notice of the charges against him and an opportunity to present his views to the prison official

7   charged with deciding whether to transfer him to administrative segregation."  <u>Hewitt v. Helms</u>,

8   459 U.S. 460, 476 (1983).  When an inmate is validated as a gang member, the actual decision to

9   segregate is made by the IGI.  <u>Toussaint v. McCarthy</u>, 926 F.2d 800, 803 (9th Cir. 1990); <u>Stewart</u>

10  <u>v. Alameida</u>, 418 F.Supp.2d 1154, 1165 (N.D. Cal. 2006) (before validation, inmate entitled to

11  informal hearing with IGI); <u>Madrid</u>, 889 F.Supp. at 1276 (the critical decision maker is the IGI).

12              Relying on an unpublished case, <u>Manisuban v. Alameida</u>, 2006 U.S. Dist. Lexis

13  7646 (N.D. Cal. 2006) (attached as Ex. O to the MSJ), defendants argue plaintiff was not entitled

14  to notice that he was being investigated for gang activity.  MSJ at 7.  Plaintiff does not argue,

15  however, that he was entitled to notice of the initial investigation; rather he relies on <u>Madrid v.</u>

16  <u>Gomez</u>, to argue he was entitled to an informal hearing with Peterson before being removed from

17  general population.  The three published cases - <u>Toussaint</u>, <u>Stewart</u> and <u>Madrid</u> - support his

18  argument.

19              Defendants also argue that <u>Toussaint</u> and <u>Madrid</u> are not controlling because the

20  ICC had the authority to refer the question of validation back to the LEIU had plaintiff presented

21  credible evidence he was not a gang associate and that therefore the ICC, not the IGI, determined

22  segregation.  Reply at 5.  However, as the court recognized in <u>Stewart</u>, 418 F.Supp.2d at 1165, an

23  inmate is transferred to segregation upon the IGI's determination and retained in segregation

24  upon the ICC's decision.

25              Peterson avers it was his practice to meet with any inmate "who is pending

26  validation, if that inmate requests to speak to me."  Peterson Decl. ¶ 6.  This statement does not

1   meet petitioner's challenge directly, as it appears that once D.T. Hawkes checked the

2   VALIDATED box on January 25, 2002, plaintiff was indeed validated as a gang associate and

3   subject to review by the ICC.  Yet at the time there would be no way for an inmate to know he

4   was indeed validated by the LEIU until he was presented with the CDC 114-D, Administrative

5   Segregation Placement Notice.  An inmate could not request a meeting with Peterson "pending

6   validation" without some sort of notice.  Accordingly, the court interprets Peterson's statement to

7   mean that once removed from general population, but before the ICC hearing, an inmate could

8   request a meeting with him.  The timing of such a meeting is too late, under Toussaint, 926 F.2d

9   at 803, Stewart, 418 F.Supp.2d at 1165, and Madrid, 889 F.Supp. at 1275-76.   Peterson is not

10  entitled to summary judgment on this claim.

11              3.  Release Of Confidential Information

12              Plaintiff suggests he was not adequately informed of the basis for his placement in

13  segregation because the confidential materials were not released to him.  He does not dispute the

14  fact that defendant Clement provided the CDC-1030 forms and chronos summarizing the

15  information supporting his validation, but argues he was entitled to receive the information itself,

16  not just the summaries.  See Arteaga Depo. at 26:24-27:2, 28: 2-5 (receipt of materials); Second

17  Am. Comp. ¶ 53 D.

18              Plaintiff's claim fails for two reasons.  First, plaintiff is aware of the birthday card

19  upon which Peterson relied, for he attached a copy to his original and first amended complaints.

20  Moreover, in opposition to the motion for summary judgment he has presented a declaration

21  from his brother Frank Venegas, averring that he received the birthday card; similarly, in his

22  grievance following the ICC hearing, plaintiff contests the meaning of the symbol on the card

23  and again argues that the card had been mailed before Peterson searched his cell.  Opp'n, Ex.

24  153, continuation pp. 7-8.  Thus plaintiff was familiar with one of the pieces of information used

25  by Peterson and the ICC to validate him.

26  /////

1    Second, in <u>Wolff v. McDonnell</u>, 418 U.S. 539, 566 (1974), the Supreme Court

2  held:

3       Prison officials must have the necessary discretion to keep the
         hearing within reasonable limits and to refuse to call witnesses that
4        may create a risk of reprisal or undermine authority, as well as to
         limit access to other inmates to collect statements or to compile
5        other documentary evidence.

6  Moreover, due process does not require prison officials to release confidential materials to the

7  inmate if institutional security concerns so dictate.  <u>Id</u>. at 568-69; <u>see</u> <u>Zimmerlee v. Keeney</u>, 831

8  F.2d 183, 186 (9th Cir. 1987) (disclosure of informant's identity); <u>Toussaint v</u>, 801 F.2d at 1101

9  (same).  This court defers to the determination by prison officials that release of information

10 would pose a threat to institutional security.  <u>Stefanow v. McFadden</u>, 103 F.3d 1466, 1473 (9th

11 Cir. 1996), <u>superseded in other part by statute</u>, <u>Navajo Nation v. U.S. Forest Service</u>, 479 F.3d

12 1024, 1033 (9th Cir. 2007).  In this case, Peterson has averred that the evidence used to validate

13 plaintiff should be not disclosed, "as disclosure could reveal the investigative process utilized by

14 the prison in validating gang members and associates.  In addition, disclosure of confidential

15 materials could compromise ongoing investigations of prison gang activity," or because the

16 releasing materials found in plaintiff's possession "may allow him the opportunity to carry out or

17 pass along information contained within the document."  Peterson Decl. ¶ 7 a-b.  This showing is

18 sufficient.  Defendants are entitled to summary judgment on this portion of the complaint.

19    C.  <u>Evidentiary Support For Administrative Segregation Assignment</u>

20    In <u>Bruce</u>, 351 F.3d at 1287, the Ninth Circuit held that a determination that a CDC

21 inmate is a gang member, and therefore appropriate for assignment to an indefinite term in

22 segregated housing, must be supported by "some evidence."  The requirement of "some

23 evidence" sets a low bar, consistent with the recognition that assignment of inmates within

24 prisons is "essentially a matter of administrative discretion," subject to "minimal legal

25 limitations."  <u>Id</u>. (citations omitted).  Even just one piece of evidence may be sufficient to meet

26 the "some evidence" requirement, if that evidence has "sufficient indicia of reliability."  <u>Id</u>. at

1288; <u>Cato v. Rushen</u>, 824 F.2d 703, 705 (9th Cir. 1987) ("relevant question is whether there is

*any* evidence in the record that *could* support the conclusion reached by the disciplinary board"

(citing <u>Superintendent v. Hill</u>, 472 U.S. 445, 455-56 (1985); emphases in original)); <u>Toussaint</u>,

926 F.2d at 803 (articulating "sufficient indicia of reliability" standard).  In <u>Bruce</u>, for example,

the court noted three pieces of evidence supported the identification of the plaintiff in that case as

a gang member: a sheriff's department report that plaintiff was a gang associate; a probation

report indicating that plaintiff's codefendant on the underlying charge had been validated as a

gang member; and a statement from a confidential informant.  <u>Bruce</u>, 351 F.3d at 1288.  The

court noted that "any of these three pieces of evidence would have sufficed to support the

validation because each has sufficient indicia of reliability." <u>Id</u>.[4]

        Defendants have submitted copies of the materials used to support plaintiff's

validation as a gang associate.  The court has examined Exhibits K and L <u>in camera</u> and finds

they satisfy the minimal "some evidence" standard.  Although plaintiff challenges the reliability

of Exhibit M, alleging that Peterson could not have found the card in his property in September

2001 because it had been mailed to Venegas in June 2001, the court need not resolve the issue,

because it finds Exhibits K and L -- documenting and analyzing communications to and from

Mexican Mafia members --reliable and sufficient in themselves to sustain the gang validation.

Moreover, the court finds the material shows plaintiff's involvement in gang activities.

Accordingly, defendants are entitled to summary judgment on this portion of the complaint.

      D.  <u>Administrative Segregation As Opposed To A Rules Violation</u>

        Plaintiff argues he was entitled to be issued a rules violation report for gang

activity, which would subject him to a disciplinary hearing with greater procedural protections.

He relies on 15 Cal. Code Regs. § 3312(a)(3) and Departmental Operations Manual (DOM)

§ 52080.3 (attached to the Opposition as Ex. 161(b)) and admissions from the defendants that he

---

[4]  These standards also were reviewed and applied in <u>Pifer v. McCarthy</u>, Case No. Civ S-87-1623 FCD KJM (<u>see</u> Findings and Recommendations filed December 14, 2006).

1  violated CDC rules prohibiting gang activity, which is considered serious misconduct.  Opp'n,

2  Ex. 163 (Peterson Admission No. 7; Clement Admission No. 8; Puig Admission No. 3; Boitano

3  Admission No. 4; Johnson Admission No. 4; Kopec Supplemental Admission No. 7).

4           In Hewitt v. Helms, 459 U.S. at 474, the Court repeated what it had held

5  repeatedly:

6           [A] prison's internal security is peculiarly a matter normally left to
          the discretion of prison administrators.  In assessing the seriousness
7           of a threat to institutional security prison administrators necessarily
          draw on more than the specific facts surrounding a particular
8           incident; instead, they must consider the character of the inmates
          confined in the institution, recent and longstanding relations
9           between prisoners and guards, prisoners inter se, and the like.

10  See also Bruce, 351 F.3d at 1287 (gang validation is an administrative, rather than a disciplinary

11  determination).  Plaintiff's reliance on the regulations concerning disciplinary violations does not

12  undercut the conclusion that prison officials have the discretion to handle gang matters as an

13  administrative matter.  The regulations, which provide the manner in which inmate misconduct

14  shall be handled, exist in conjunction with 15 California Code of Regulations

15  § 3341.5(c)(2(A)(2), which provides that a validated gang member is deemed to be a threat to the

16  security of the institution and subject to SHU placement, without further requiring that the gang

17  member be charged with misconduct.  Defendants are entitled to summary judgment on this issue

18  as well.

19           E.  Property Receipt

20           Defendants argue that because plaintiff has no property interest in contraband, he

21  has no due process right to a receipt for the gang materials seized from his property.  MSJ at 11.

22  Plaintiff counters that under 15 California Code of Regulations § 3287(a)(4) and DOM

23  § 54030.13, which provide that an inmate will be given written notice of any items of property

24  taken during a search, which "will list any contraband picked up . . . and the follow-up action

25  intended by the inspecting officer," he was entitled to a receipt.

26  /////

1          An inmate does not have a property interest in possessing contraband.  <u>Steffey v.</u>

2   <u>Orman</u>, 461 F.3d 1218, 1221 (10th Cir. 2006); <u>Lyon v. Farrier</u>, 730 F.2d 525, 527 (8th Cir.

3   1984).  Gang-related materials fall within California's definition of contraband.  15 Cal. Code

4   Regs. § 3006 (c)(16) ("material that is reasonably deemed to be a threat to legitimate penological

5   interests").  Because plaintiff has no property interest in possessing gang related materials, he is

6   not entitled to procedural due process when these materials are removed from his possession.

7   <u>Steffey</u>, 461 F.3d at 1221.  A receipt for the property is a procedural protection.  <u>See</u> <u>Stewart v.</u>

8   <u>McGinnis</u>, 5 F.3d 1031, 1036 (7th Cir. 1993).

9          It is true that California regulations require that notice be given when contraband

10  is seized.  15 Cal. Code Regs. § 3287(a)(4).  However, the failure to follow these regulations

11  does not translate into a due process violation.  <u>Bostic v. Carlson</u>, 884 F.2d 1267, 1270 (9th Cir.

12  1989).  Peterson is entitled to summary judgment on this claim.

13        F.  <u>Classification Review</u>

14        Plaintiff alleges he was denied a meaningful classification review when defendant

15  Puig upheld the SHU placement on the basis that plaintiff was a proven threat to institutional

16  security, even though he did not issue plaintiff a rules violation report for any alleged conspiracy

17  against the safety of others.  As noted above, however, prison officials have broad discretion to

18  use administrative rather than disciplinary means against gang members and associates.  Puig is

19  entitled to summary judgment.

20        G.  <u>Vague Regulations</u>

21        As part of the first cause of action in the second amended complaint, plaintiff

22  challenges the gang validation regulations as vague and overbroad.  Specifically, he alleges the

23  defendants implemented regulations that utilize gang validation as a pretext to justify

24  indeterminate SHU confinement, delegate unbridled discretion to defendants, reach innocent

25  conduct, and fail to give inmates notice of what is prohibited.  Second Am. Compl. ¶ 54.

26  /////

Defendants have not addressed this claim in the motion for summary judgment, so it remains in the case.

    H.  Penal Code Section 2932

        The court finds this portion of the complaint fails to state a claim.  California Penal Code section 2932 outlines the procedures to be followed when an inmate is deprived of already-earned good time credit as the result of a disciplinary violation.  Plaintiff has not alleged he was subject to disciplinary proceedings or that he lost accumulated good time.

    I.  Defendant Stone

        Plaintiff concedes he will not be able to prevail as to defendant Stone and asks that the court dismiss him from the action.  Defendants have not objected.

        IT IS HEREBY RECOMMENDED that:

        1.  The action against defendant Stone be dismissed.

        2.  The cause of action based on California Penal Code section 2932 be dismissed for failure to state a claim.

        3.  Summary judgment be granted as to the following claims:

        a.  That plaintiff was denied due process because he was not assigned a staff assistant and not permitted to call witnesses at the ICC hearing;

        b.  That plaintiff was denied due process when the confidential material was not released to him;

        c.  That the evidence used to validate plaintiff met the "some evidence" standard;

        d.  That plaintiff was denied due process because he was not issued rules violation reports for his gang activities;

        e.  That plaintiff was denied due process when he was not issued a receipt for property seized from his cell; and

        f.  That plaintiff was denied a meaningful classification review.

1    4.  Summary judgment be denied as to the following claims:

2    a.  That plaintiff was denied a meaningful hearing before the ICC;

3    b.  That plaintiff was not afforded an informal hearing with the IGI before

4    being placed in segregation; and

5    c.  That the gang validation regulations are vague and overbroad.

6    5.  Dates for the submission of pretrial statements, pretrial conference and trial be

7    set if the district court adopts these findings and recommendations.

8    These findings and recommendations are submitted to the United States District

9    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

10   days after being served with these findings and recommendations, any party may file written

11   objections with the court and serve a copy on all parties.  Such a document should be captioned

12   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13   shall be served and filed within ten days after service of the objections.  The parties are advised

14   that failure to file objections within the specified time may waive the right to appeal the District

15   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16   DATED:  February 8, 2008.

17

18   _____
     U.S. MAGISTRATE JUDGE

19

20

21

22   2/arte1004.57

23

24

25

26

18